IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND



| | | |
|---|---|---|
| JONATHAN F. BOOTH | * | |
| v. | * | Civil No. JFM-02-160 |
| STATE OF MARYLAND, et. al | * | |

MEMORANDUM

Plaintiff Jonathan F. Booth has brought this suit against the State of Maryland and five of its employees who work for the Department of Public Safety and Correctional Services, Division of Pretrial Detention and Services ("the division").[1] Booth, a member of the Rastafarian religion, has been subjected to progressive disciplinary action for wearing his hair in modified dreadlocks while on duty as a uniformed prison guard in violation of division policy. He alleges violations of §§ 1981 and 1983 and Articles 24 and 36 of the Maryland Declaration of Rights as well as defamation. He seeks injunctive, declaratory and compensatory relief. Both Plaintiff and Defendants have moved for summary judgment. Defendants' motion for summary judgment will be granted and Plaintiff's motion for summary judgment will be denied.[2]

I.

Booth has been employed for more than six years as a Correctional Officer at the

---

[1] Booth has sued the individual defendants in their official and individual capacities.

[2] The opinion that follows addresses Counts II, III, V, VI, and VII. Count I, which requests injunctive relief, will be dismissed as moot because no violation exists. Count IV requests declaratory relief against all defendants for the same violations that are alleged in Counts II, III, V, and VI. Therefore, defendants' motion for summary judgment on Count IV will be granted for the same reasons that it will be granted on Counts II, III, V, and VI.

Baltimore Central Booking and Intake Center (BCBIC). As part of his religious practice he wears his hair in dreadlocks. From a photograph provided by Booth, it appears that the dreadlocks are braided, short and kept neatly tucked against Booth's scalp. See Booth Aff. Ex. 1.

After being requested to cut his hair on several occasions by his superiors, Booth wrote to the Warden of the BCBIC, William Jednorski, on November 25, 2001 to notify Jednorski that he was a Rastafarian and that he wore his hair in dreadlocks for religious reasons. See Booth Aff. Ex. B. On November 29, 2001, Jednorski sent Booth's letter to the Commissioner of the Division of Pretrial Detention and Services, Lamont Flanagan, and informed the commissioner that he intended to impose progressive discipline against Booth for violation of divisional policy 50-43. See Booth Aff. Ex. C. Section VI.C.2.c. of policy 50-43 states that "[o]nly traditional (i.e., historically acceptable for military/law enforcement uniformed personnel), haircuts shall be permitted." On that same day, Chief of Security George Childs informed Booth that his hairstyle violated division policy and that progressive disciplinary action would be taken if he did not cut it. In response, Booth completed a Matter of Record/Information Report which stated that he wore dreadlocks for religious reasons and that he believed that he was the victim of discrimination. He stated that he did not know what was a traditional military hairstyle and that many female employees regularly violated the division policies on personal appearance. See Booth Aff. Ex. D.

Between December 4, 2001 and January 3, 2002, Booth was subjected to progressive disciplinary measures for violation of policy 50-43 and the department's related Standards of Conduct and Internal Disciplinary Process. On each occasion, Booth was cited for violation of section VI.C.2.c of policy 50-43 and sections II.GG and IV.E.a.1.16 of the Standards of Conduct

and Internal Disciplinary Process. Section II.GG states that "[a]n employee shall set a positive example in his/her overall appearance and grooming" and section IV.E.a.1.16 requires employees to "maintain proper appearance." See Booth Aff. Exs. E, G, H, J, K, N, O. On several occasions during this period Booth completed Matter of Record/Information Reports stating that he believed he had been singled out for discrimination. He named three fellow employees, officers Lombardi, Goodman and Lee, that he claimed were violating the division's grooming policies and also stated his belief that none of his superiors had military hairstyles. See Booth Aff. Ex. F, I, L, M, P. Booth also attended two disciplinary mitigation conferences where he informed Chief of Security Childs that he wore dreadlocks because it was required by his religion. See Booth Aff. at ¶¶ 18, 21.

During this litigation, the defendants have acknowledged that in 1995 two employees, one Jewish and one who is apparently Sikh,[3] were given religious exemptions from the grooming policy. See Jednorski Sur-Reply Aff. at ¶ 5; Price Sur-Reply Aff. at ¶ 2. One of the employees continues to work for the division and still had the exemption when this litigation began. See Price Sur-Reply Aff. at ¶ 3. In addition, Booth has identified thirteen other employees that he claims violated the division's policies regarding appearance. See Booth Aff. at ¶ 25. The imposition of progressive disciplinary actions against Booth for wearing dreadlocks has been halted pending the outcome of these motions.

II.

In Count II of his complaint, Booth alleges that the individual defendants have violated

---

[3] I am assuming that this employee is Sikh based on the fact that he is required by his religion to wear a turban and long beard and that he is described as being of Indian descent. This employee's particular religious affiliation is inconsequential to the present motions.

the Free Exercise Clause of the First Amendment by refusing to accommodate his religious beliefs and progressively disciplining him pursuant to policy 50-43. This claim is brought pursuant to 42 U.S.C. § 1983. The Supreme Court has held that "a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice." American Life League, Inc. v. Reno, 47 F.3d 642, 654 (4th Cir. 1995) (citing Employment Div., Dept. of Human Resources v. Smith, 494 U.S. 872, 878-79 (1990)); see also Hines v. S.C. Dept. of Corrections, 148 F.3d 353, 357 (4th Cir. 1998). Here, there is no indication, either from their language or effect, that the rules that Booth challenges as violative of his rights were targeted at Rastafarians or members of other religious groups.[4] The rules "make[] no distinction between action based on religious conviction and action based on secular views" so they are "generally applicable . . ., neutral toward religion and not violative of the First Amendment." See id.

Booth argues that because there are secular exemptions to the appearance rules but not religious exemptions, the rules should be subject to heightened scrutiny despite the Supreme Court's decision in Smith.[5] He cites Fraternal Order of Police Newark Lodge No. 12 v. City of

---

[4] Booth has two bases for a claim that he was targeted based on his religious beliefs: (1) the defendants' failure to enforce the rule against other individuals with no religious purpose for their failure to comply with it; and (2) the fact that in 1995 two individuals, one Sikh and one Jewish, were granted exemptions from the same rules that Booth now challenges. See Jednorski Sur-Reply Aff. at ¶ 5; Price Sur-Reply Aff. at ¶ 2. However, any targeting of Booth based on his religious beliefs was not based on the rule that Booth now challenges but on the defendants' allegedly discriminatory enforcement of the rule against him. Such a claim of discriminatory enforcement would be based on Title VII, 42 U.S.C. § 2000e, not the First Amendment.

[5] Although the rules do not provide explicitly for religious exemptions, the defendants have granted them in the past because they believed they were required to do so pursuant to Title VII. See Jednorski Sur-Reply Aff. at ¶ 5; Price Sur-Reply Aff. at ¶2. The defendants now claim

Newark, 170 F.3d 359 (3d Cir. 1999), in which the Third Circuit applied a heightened level of scrutiny to a police department's grooming regulation prohibiting beards. Id. at 365-66. The regulation was challenged by two Muslim police officers who were required to wear beards by their religion. Id. at 360. The challenged regulation had a medical exemption to its requirement that all officers be clean shaven. Id. at 365. The court held that heightened scrutiny should be applied when a rule carves out a secular exemption but does not provide for a religious one. Id.; see also Smith, 494 U.S. at 884 ("[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason.").

Policy 50-43 does include a medical exemption as part of its facial hair rule, but it does not make any exceptions to its hairstyle rule. While the hairstyle and facial hair rules are part of the same policy, they are written as two separate and distinct subsections that are independent from one another. The drafters of policy 50-43 could have fashioned the policy so that the medical exemption applied to the entire policy, but they specifically limited it to the facial hair section, presumably the only place where it was appropriate. For these reasons, heightened scrutiny of the hairstyle policy is not required. See Robinson v. District of Columbia, 1999 WL 420298, at *7 (D.D.C. 1999) (refusing to apply heightened scrutiny to policy that prohibited police officer from wearing dreadlocks where part of policy addressing facial hair had

---

that they will revoke the one current religious exemption because they believe that it is not required by Title VII. See Price Sur-Reply Aff. at ¶ 3. Booth has not brought a failure to accommodate claim pursuant to Title VII so I will not consider whether it would be an undue hardship for the defendants to grant him an accommodation. For the purpose of this motion, I will assume that there are no religious exemptions to the hairstyle policy.

5

individualized exemptions but part of policy addressing hairstyles did not).[6]

The challenged rules are rationally related to the division's legitimate interests in public safety, discipline and esprit de corps.[7] The defendants argue that requiring guards to have traditional military or law enforcement hairstyles allows them to be distinguished from prisoners during attempted uprisings or escapes. See Jednorski Aff. at ¶¶ 8-10; Childs Aff. at ¶¶ 8-10; Price Aff. at ¶¶ 8-10, 13-16. In addition, the defendants offer testimony that such hairstyles engender respect from prisoners and foster esprit de corps. Price Aff. at ¶¶ 17-18. While the defendants' explanation that guards with dreadlocks might be confused with prisoners during an uprising or attempted breakout might be considered questionable and its elaboration in the present record of its policy rationales is sparse, the defendants have met their low burden. See Hines, 148 F.3d at 358 (explaining that in a rational relationship test, "once the Department demonstrates it is pursuing a legitimate governmental objective, and demonstrates some

---

[6] Booth also argues that the different hairstyle rules that apply to female uniformed employees are a secular exemption that should trigger heightened scrutiny. While the policy does distinguish between men and women, it is difficult to conceptualize this as an exemption. Section VI.C.2.b of policy 50-43 permits female employees to wear "buns, braids and ponytails . . . on top of the head or back of the head, in a neat manner . . ." However, females are still subject to section VI.C.2.c which allows only traditional military or law enforcement haircuts.

Furthermore, the alleged failure to consistently enforce the rule against other employees does not qualify as a secular exemption. These employees enjoy no greater protection under the terms of the rule than does Booth. All of them are still subject to discipline for its violation. This allegedly inconsistent enforcement of the rule might form part of the basis of a prima facie case of religious discrimination pursuant to Title VII, but Booth has not made such a claim.

[7] Booth argues that the defendants' failure to consistently enforce its policy demonstrates that the defendants' stated legitimate reasons are not their real reasons for the policy, but are only pretext for their discrimination against him. This argument might be persuasive if Booth was pursuing a Title VII discrimination claim, but he is not. Booth has not addressed the legitimacy of the defendants' stated interests.

6

minimally rational relationship between that objective and the means chosen to achieve that objective, we must approve of those means"); but see Francis v. Keane, 888 F.Supp. 568, 578 (S.D.N.Y. 1995) (denying summary judgment to correctional facility that prohibited officers from wearing dreadlocks where defendants relied on conclusory statements that failed to demonstrate, with any specificity, how hairstyle policy advanced their asserted interests in safety, discipline and esprit de corps). "In the day to day struggle to maintain order and discipline in prison, matters such as how prison employees dress, and whether they conform to policies, have a real impact." Blanken v. Ohio Dept. of Rehabilitation and Correction, 944 F.Supp. 1359, 1368 (S.D. Ohio 1996). Public safety, discipline and esprit de corps are all legitimate interests and no rational jury could find that the department's hairstyle policy is not at least minimally rationally related to those interests.

### III.

In Count III of Booth's complaint, he alleges a violation of 42 U.S.C. § 1981 based on racially disparate discipline. Booth claims that other employees also violated department grooming policies and were not disciplined during the period of time when he was disciplined. In the Matter of Record/Information Reports that he filed, he named three fellow employees. In the affidavit Booth submitted, he identifies 13 more employees. Booth Aff. at ¶ 25. While it is not possible to determine the race of each individual that Booth has identified, at least some of the individuals are African-Americans like Booth.

While it does appear that Booth may have been singled out for disparate treatment, both white and African-American employees were treated differently than Booth. Based on this record, it is not possible to infer that any disparate discipline against Booth was motivated by

racial discrimination. For this reason, Booth is unable to establish a prima facie case of racially disparate discipline. Cook v. CSX Transp. Corp., 988 F.2d 507, 512 (4th Cir.1993) ("The question confronting a judge . . . is whether the record as a whole gives rise to a reasonable inference of racially discriminatory conduct by the employer.").

IV.

Count V of Booth's complaint alleges a violation of Article 24 of the Maryland Declaration of Rights. "Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment of the United States Constitution have the same meaning, and . . . Supreme Court interpretations of the Fourteenth Amendment function as authority for interpretation of Article 24." Pitsenberger v. Pitsenberger, 410 A.2d 1052, 1056 (Md. 1980). Given the terse and vague nature of Count V, Booth's theory of recovery under this provision is far from clear. The defendants have treated Booth's claim as one for deprivation of his liberty interest in styling his hair as he chooses. Booth has not challenged that characterization. In Kelley v. Johnson, 425 U.S. 238, 247 (1976), the Supreme Court considered a Fourteenth Amendment challenge to a county police grooming regulation and held that such a regulation was valid so long as it passed a rational basis review. Id. at 247-48. As discussed in section II, the department's hair style regulation passes a rational basis review. For this reason, the defendants' motion for summary judgment will be granted.

V.

Count VI of Booth's complaint alleges a violation of Article 36 of the Maryland Declaration of Rights. First, it is not clear that "Maryland law [provides a] private right of action for damages under this Article." Baird v. Haith, 724 F. Supp. 367, 384 (D. Md. 1988). Even if it

8

does, the analysis under Article 36 would be identical to the analysis under the Free Exercise Clause of the First Amendment. See Montrose Christian School Corp. v. Walsh, 770 A.2d 111, 123 (Md. 2001) ("The Free Exercise Clause of the First Amendment and Article 36 of the Maryland Declaration of Rights ordinarily do not grant to an individual or a religious organization 'a constitutional right to ignore neutral laws of general applicability' even when such laws have an incidental effect of burdening a particular religious activity."). Therefore, the analysis and result would be the same as in section II. For these reasons, the defendants' motion for summary judgment will be granted.

VI.

Count VII of Booth's complaint alleges that the defendants defamed him by producing and disseminating documents that accuse him of failing to comport his appearance with regulations. "Under Maryland law, to present a prima facie case for defamation, a plaintiff must ordinarily establish that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm." Gohari v. Darvish, 767 A.2d 321, 327 (Md. 2001). There is no evidence in the record that a false statement was made about Booth. Regardless of the merits of the challenged rules, it is true that Booth violated them. The defendants' motion for summary judgment will be granted.

Date: June 3 2002

J. Frederick Motz
United States District Judge